**UNITED STATES of America, Plaintiff,**

v.

**CERTAIN LAND IN the CITY OF RALEIGH, COUNTY OF WAKE, STATE OF NORTH CAROLINA, and Emily Purcell et al., and Unknown Owners and Claimants, Defendants.**

**Civ. No. 1765.**

United States District Court

E. D. North Carolina, Raleigh Division.

Oct. 23, 1967.

---

Robert H. Cowen, U. S. Atty., and William S. McLean, Asst. U. S. Atty., Raleigh, N. C., for plaintiff.

Armistead J. Maupin, of Maupin, Taylor & Ellis, Raleigh, N. C., for claimant, Julian Tucker Baker.

## MEMORANDUM OPINION

EDWIN M. STANLEY, Chief Judge.[*]

The only issues left for determination in this land condemnation action are the interest, if any, owned by Julian Tucker Baker, one of the claimants, in a 10-foot alleyway, and the amount of just compensation to be awarded in the event it is determined that he owned the unencumbered fee simple title to the alleyway at the time of the taking.

The matter has been submitted to the Court for consideration and decision on stipulated facts and documents.

After considering the pleadings and stipulations, including stipulated documents, the following pertinent facts are found:

## FACTS

1. The authority of the plaintiff to acquire the fee simple title to the property described in the Complaint in Condemnation is conceded, and there is no question concerning jurisdiction.

2. Prior to the year 1920, the Florence Tucker Estate was the owner of a tract of land in the City of Raleigh, Wake County, North Carolina, bounded on the north by New Bern Avenue, on the east by Bloodworth Street, and on the south by Morgan Street.

---

[*] Chief Judge, United States District Court, Middle District of North Carolina, sitting by designation.

3. Before the tract of land was offered for sale, same was subdivided into six lots and a 10-foot alleyway. Three of the lots front on New Bern Avenue, and the other three on Morgan Street. The 10-foot alleyway runs westwardly from Bloodworth Street approximately 101.57 feet, and runs to the rear of the lots fronting on New Bern Avenue and Morgan Street.

4. Sometime before 1920, a plat of the property comprising the six lots and the alleyway was prepared and filed in the office of the Register of Deeds of Wake County, North Carolina, and duly recorded in said office in Book of Maps 1920, Volume 1, page 2. Appendix A is a reproduced copy of said map. Because of the difficulty experienced in reducing the size of and reproducing the map, and in the interest of clarity, the boundaries of the six lots and of the alleyway have been retraced, and the typing appearing thereon has been added.

5. During the year 1920, the Florence Tucker Estate conveyed the six lots, and deeds evidencing the conveyances were duly recorded in the office of the Register of Deeds of Wake County, North Carolina, during said year. The 10-foot alleyway has never been conveyed. The description of each lot was by lot number and by metes and bounds, and each was described as bounded by the alleyway shown on Appendix A. Typical of the language used in each of the deeds is that used in respect to the conveyance of Lot #5, as follows:

"have bargained and sold and by these presents do bargain, sell grant and convey unto the said W. L. Johnson, his heirs and assigns

A lot of land with the buildings thereon called No. 323 E. Morgan Street in Raleigh, N. C. situate on the North side of E. Morgan Street between S. Person and S. Bloodworth Streets in Raleigh, N. C.—being Lot No. 5 on the MAp of 'Part of Tucker Estate—New Bern Avenue—Bloodworth and Morgan Streets, Raleigh, N. C.' made March 1915, Nov. 1919, by Riddick & Mann, Map Book 1920 page 2, and on said map described as bounded by a line.

Beginning at an iron pipe on the North line of said E. Morgan Street—said pipe being 84.8 feet Westwardly from the center of said Bloodworth Street and being 33 feet Northwardly from the center of Morgan Street, and being at the Southwest corner of LOT No. 6 on said map—runs thence westwardly along the North line of Morgan Street 50 feet to an iron pipe at the Southeast corner of Lot No. 4 on said map, thence NORthwardly 93.2 feet along the East line of said Lot No. 4 to the South line of a 10 feet wide east and west alley, thence Eastwardly along the South line of said Alley 53.5 feet to a point in the NOrthwest corner in said Alley of Lot No. 6 on said map, thence southwestardly 6.5 feet along the NORthwest line of said LOT No. 6 to a point in the WEst line of said Lot No. 6, thence southwardly 87.3 feet along the West line of said LOt No. 6 to the beginning.

TO HAVE AND TO HOLD the same together with all rights, tenements, hereditaments, privileges, easements and appurtenances thereunto in any wise appertaining or belonging to it the said W. L. Johnson, his heirs and assigns, in a full and ample a manner as the said parties of the first part have power and authority to convey the same."

6. Until January 5, 1960 the Wachovia Bank and Trust Company was executor and trustee of the estate of Mrs. Florence Tucker. On that date, the bank conveyed all the remaining real-estate owned by said estate to Julian Tucker Baker, the grandson of the late Mrs. Florence Tucker. It is by virtue of this deed, recorded in Book 1392, at page 577, in the Wake County Registry, that title is claimed by Julian Tucker Baker to the 10-foot alleyway.

7. During the month of August, 1965, the United States of America acquired by warranty deeds the fee simple title to Lots 1, 2, 3 and 5. The deeds

recite that the grantors also convey all their right, title and interest in and to the 10-foot alleyway to the grantee, the United States of America. The deeds were duly recorded in the Wake County registry on August 27, 1965, in Deed Book 1665, at pages 567 and 569.

8. On September 27, 1965, the plaintiff, United States of America, instituted this condemnation action by the filing of Complaint in Condemnation, Notice of Condemnation, and Declaration of Taking. Six separate parcels of land were described in the proceeding, including Lots 4, 6 and the 10-foot alleyway, all as shown on Appendix A. The alleyway was designated in the proceeding as Parcel No. 4, Lot 6 was designated as Parcel No. 5, and Lot 4 was designated as Parcel No. 6. In November of 1965, stipulations and final judgments were entered with respect to Parcels Nos. 5 and 6 (Lots 4 and 6), wherein the former owners agreed that the amount of just compensation being paid included their right, title and interest in and to the 10-foot alleyway.

9. By the aforementioned deeds and stipulated judgments, the United States of America has acquired fee simple title to Lots 1 through 6, Appendix A, together with all right, title and interest of all adjoining landowners in and to Parcel No. 4, the 10-foot alleyway. Consequently, the only remaining issue for determination is the interest, if any, of Julian Tucker Baker in the alleyway. If he has an interest, the issue of just compensation is then presented for determination.

10. The reasonable market value of the unencumbered fee simple title to Parcel No. 4 was $3,050.00 as of the date of the filing of the Declaration of Taking.

11. From and after the date of the conveyances of the six lots by the Florence Tucker Estate in 1920, to and including the date of the filing of the Declaration of Taking in this action, the grantees in said deeds, and their successors in interest, have continuously used the alleyway, both as a driveway and a walkway, for ingress and egress to Bloodworth Street.

12. The City of Raleigh has never passed any ordinance relating to the acceptance of the alleyway for public purposes. Neither has the City of Raleigh ever paved or done any construction work in relation to the alleyway, except for a paved drive at the entrance of the alleyway extending from Bloodworth Street to the sidewalk on the west side of Bloodworth Street, which sidewalk runs parallel to Bloodworth Street.

13. Neither the Florence Tucker Estate nor its successors in interest, including the claimant, Julian Tucker Baker, up to and including the date of the filing of the Declaration of Taking herein, has filed in the register's office of the county where the land lies a declaration withdrawing the alleyway from public or private use, as provided by § 136–96, General Statutes of North Carolina.

14. Julian Tucker Baker has never paid any real property taxes in respect to the alleyway, and the taxing authorities have never billed him for any real property taxes in respect thereto.

## DISCUSSION

It is the plaintiff's position that the deeds from the Florence Tucker Estate conveying the lots bordering on the alleyway included the land to the center of the alleyway, subject only to an easement of the other landowners bordering on the alleyway. As a consequence, plaintiff argues, its acquisition of all the six lots bordering on the alleyway vested in it the unrestricted fee simple title to the entire ten-foot alleyway. The claimant, Julian Tucker Baker, on the other hand, asserts that the deeds from the Florence Tucker Estate at most conveyed an easement in the alleyway to the adjoining landowners, and that when the easement, through the acquisition of the entire tract by the plaintiff, became no longer necessary, the unrestricted fee simple title to the alleyway reverted to the Florence Tucker Estate and its successors in interest.

After a careful analysis of the cases cited by the plaintiff and defendant, the Court is of the opinion that the plaintiff is entitled to prevail.

Since there is no evidence that the City of Raleigh ever accepted, kept up, maintained or controlled the alleyway in question, same has not been dedicated to any public authority. Neither party contends otherwise. This well-settled principle of law is stated in Wofford v. North Carolina State Highway Com'n, 263 N.C. 677, 140 S.E.2d 376 (1965) as follows:

"The streets of a subdivision are not dedicated to the public merely by reason of the subdivision of the land and the recordation of a map thereof. This is only an offer to dedicate; dedication to the public is complete only when the offer is accepted by the responsible public authority, and neither the burdens nor benefits with attendant duties may be imposed on the public unless in some proper way it has consented to accept and assume them."

With respect to the interest of Julian Tucker Baker in the alleyway, the most factually similar case that has been cited or found is Patrick v. Jefferson Standard Life Ins. Co., 176 N.C. 660, 97 S.E. 657 (1918). That action involved the title to a 4-foot strip, or western half, of an 8-foot alley, which the plaintiff claimed she acquired as devisee under the will of her husband, Thomas J. Patrick. In 1862, Patrick conveyed to Porter & Gorrell, a lot bordering on the alleyway, which conveyance left the western half of the alley in the seizure of Patrick which he covenanted, for himself and heirs and assigns, should continually be left open as a passageway for himself and Porter & Gorrell, and should not be obstructed by him or them or any other person. Patrick also owned another lot, to rear of the lot sold to Porter & Gorrell, which fronted on the 8-foot alleyway. In the conveyance of this latter lot, Patrick likewise mentioned the easement in the alley. Guilford County later acquired by purchase title to all the land which surrounded the entire alleyway. Jefferson Standard Life Insurance Company, the defendant in the action, subsequently acquired all the land fronting the alleyway from Guilford County. The Supreme Court affirmed the judgment of the trial court, entered upon a jury verdict, to the effect that the County acquired title to the 4-foot strip by adverse possession, and then went on to state:

"But there is another ground upon which the plaintiff must fail. It is manifest from the entire case, and a proper construction of the respective deeds, that Mr. Patrick never intended to sever the strip from the lots he conveyed and to retain title to it as separate and distinct from the other land. His clear intention was to retain control over the strip for the purpose only of protecting the right of way over it for the use and benefit of the Porter & Gorrell lot and the one he owned adjoining and to the north of it. We have the right, when interpreting a transaction like this one, in order to ascertain its nature and purpose, to take into consideration the object and motive of the parties, or what they intended to accomplish, as shown by the several deeds for the property in dispute, and to survey the situation as a whole. Mr. Patrick owned a lot back of the one he sold to Porter & Gorrell, and he desired an exit from it to West Market street. It was necessary for the better and more convenient enjoyment of his tenement, and the same is true as to the lot he sold to Porter & Gorrell. These lots bordered on the alley, and adjoined that part of it over which he reserved the right of way. As he owned that half of the alley, the fee in it, if nothing was said to the contrary, would have passed with the lots conveyed by him to Porter & Gorrell and to W. A. Caldwell. The following cases state and illustrate the principle:

A conveyance describing a lot in a deed 'as bounded by an alley which is laid off on a certain plat will pass the title to the center of the alley if the grantor's title extended so far, and

it is immaterial whether or not the alley is ever brought into public use.' Jacob v. Woodfolk, 90 Ky. 426, 14 S.W. 415, 9 L.R.A. 551.

'A conveyance of land bounded "along" a certain lane which was laid out entirely on the grantor's land, but on the margin thereof, carries the fee in the whole roadbed, and especially where all the land bordering on the lane was conveyed.' Haberman v. Baker, 128 N.Y. 253, 28 N.E. 370, 13 L.R.A. 611.

'Where an alleyway (owned by the grantor) was laid out on the extreme edge of a lot, a deed conveying it, and referring to it in the general description by reciting its number, was held to carry the bed of the alley, notwithstanding the alley was referred to in the particular description as the boundary of the lot. If the owner of the land conveyed in two parcels, describing them as the northern and southern halves by metes and bounds, and as bounded southerly and northerly respectively by an alley, and such metes and bounds would establish an alley between them, while the strict division into halves would make the center line of such alley the division line between the parcels, the deed should be so construed as to vest in each grantee title to the center of the alley.' Albert v. Thomas, 73 Md. 181, 20 Atl. 912; F[irst] P[resbyterian] Church [of St. Charles] v. Kellar, 39 Mo.App. 441. * * *

The clear intention here was to convey to the center of the alley with Patrick's one-half of the alley burdened with the right of way given by the deed. Mr. Patrick could derive no benefit from his half of the alley except by using it for the purpose of an exit from his lots and Porter & Gorrell's lot. When Patrick comes to make a deed to the third lot on which the northern end of this alleyway abutted, he made no reference to reserving any alleyway or rights or title therein, and this was the only property owned by him in the block. Hence, after conveying up to the

line of the old county square, he, by the habendum clause in the deed, vests in the grantee whatever rights might attach to this lot by his ownership on account of the reservation of easements and rights of way in the Porter and Gorrell lots. The provision in the deed, 'to have and to hold, together with all appurtenances and privileges thereunto in any wise belonging and appertaining, unto him in fee simple,' etc., disposed of the last and remaining interests which he had in any land or easements in said square.

\* \* \* \* \* \*

The express uses for which Patrick retained certain rights in the alleyway are nothing more than easements appurtenant to the lots; hence, when the lots were sold, the appurtenant easements went with them, and no estate was left in Patrick such as would enable him, after a long residence in Virginia, or his devisees nearly 30 years after his death, to assert against the county, which had been in open and notorious possession of both the lots and the strip of land for nearly 50 years.

\* \* \* \* \* \*

In Smith v. [City of] Goldsboro, 121 N.C. [350] 242, 28 S.E. [479] 480, in discussing a similar question, the court says:

'In other words, he opens streets to induce parties to purchase the lots, which they would not have done had not the streets been opened. While he may have retained the fee of the streets, inasmuch as he did not convey it to any one, he could not have expected any personal benefit therefrom, as he now is not even an abutting owner, as appears from the record. He was fortunate in being able to dispose of all his lots at prices presumably satisfactory to himself. This, which would otherwise have been impossible, he was enabled to do by opening the streets in controversy, and he should not now be heard to assert any ownership in said streets to the injury of the parties whom he thus induced to purchase.'

The last case decided by this court is very much in point. Mr. Patrick opened the alley, with the county, to render his lots salable, by creating an easement appurtenant over the alley, for the purpose of accessibility to the street, without the intention, though, of ever claiming any interest otherwise in the alley, and dedicating it solely to that purpose. When the dominant tenements were purchased by the county, and made a part of the square surrounding the courthouse, the right of way was no longer needed, and was thereby extinguished, and the servient tenement, if we may so call it, or the strip of land which was so used as a way to the street, was merged into and became a part of the square. When he reserved the 'seizure' of the strip, he simply meant that the fee should pass to his grantees subject to the right of way, and, in order to preserve this easement intact to him and his assigns, he should have control of the strip so long as necessary for that purpose. This is the interpretation given to similar conveyances in the cases we have before cited.

We would not impute to Mr. Patrick the motive in making the reservation that he did so for the purpose of annoying and harassing his neighbors by excepting from his conveyance the fee of a narrow strip of land, which without the easement, could be of no conceivable benefit to him, and holding it so that he could exact a high and unreasonable price for it from them. It would have no value to him after he had sold his lots, save for such an unworthy purpose, which should not be attributed except upon such convincing proof as to make the inference inevitable. He had a more benevolent end in view. It is strange, too, as an additional reason for our construction, that so long a time, nearly one-half century, should elapse before any claim is made to this property. The deeds from W. C. Porter, and the one from W. A. Caldwell, to the county of Guilford, were executed in February, 1873, the Gorrell deed to the county in 1873, the deed of Patrick to Gorrell in 1871.

As illustrating, and we think strongly emphasizing the purpose and intention of Patrick in making the reservations in the deeds above referred to, and also as showing the interest which he understood was reserved to him thereby, we may well refer to his own conduct. After conveying the third lot, at the end of the alleyway in the block, to Porter in 1871, there is no evidence that Patrick ever exercised any ownership or control over the strip in question, or sought to do so, and although he lived for 20 years thereafter, he never sought to assert any claim to the strip in question, or objected to the county's plowing it, planting the square in trees, and fencing it off, as part of the square, from the street, and even after his death nearly 30 years elapsed before any one representing his estate conceived the idea of ownership in said strip of land. This recent claim was evidently founded upon a mistaken apprehension as to the nature and extent of Patrick's right in this 4-foot strip of land.

\* \* \* \* \* \*

We are permitted to scan the entire field of inquiry and to consider the transaction as a whole, and with reference to all its parts, in order to ascertain the true meaning of the grantor. (Citations Omitted) Courts are always desirous of giving effect to instruments according to the intention of the parties, so far as the law will allow. It is so just and reasonable that it should be so that it has long grown into a maxim that favorable constructions are put on deeds. Kea v. Robeson, 40 N.C. 373; Rowland v. Rowland, 93 N.C. 214. Chief Justice Taylor expressed this idea when he said that the very purpose of the law would seem to be to ascertain with more particularity what it was apprehended might not have been otherwise sufficiently described. Campbell v. McArthur, 9 N.C. 38, 11 Am.Dec. 738. It may be taken as settled that courts will, for the purpose of ascertaining the intention of the parties, endeavor to place

themselves in the position of the parties at the time of the conveyance. Cox v. McGowan, 116 N.C. 131, 133, 21 S.E. 108, and Justice Connor in Modlin v. [Roanoke] Railroad [& Nav.] Co., 145 N.C. [218] 229, 58 S.E. 1075. It all is bottomed upon the ancient maxim that contemporaneous exposition is the best and strongest in law ('Contemporanea expositio est optima et fortissima in lege'). Our best and surest guide, therefore, in construing instruments, is found in referring to the time when, and the circumstances under which, they were made. Broom's Legal Maxims (6th Am.Ed.) star page 654. It is not difficult by reading the deeds and considering the attendant circumstances to reach a satisfactory conclusion as to what the parties meant, and we are required by the settled canon of construction so to interpret them as to ascertain and effectuate the intention of the parties. Their meaning, it is true, must be expressed in the instruments, but it is proper to seek for a rational purpose in the language and provisions of the deed and to construe them consistently with reason and common sense. If there is any doubt entertained as to the real intention, we should reject that interpretation which plainly leads to injustice and adopt the one which conforms more to the presumed meaning, because it does not produce unusual and unjust results. All this is subject, however, to the inflexible rule that the intention must be gathered from the entire transaction 'after looking,' as the phrase is, 'at the four corners of it.' If we adopt this course, which is strongly commended to us, we can easily see that Mr. Patrick had no idea of retaining any title to the land, except for the purpose of the easement, and then so long only as it lasted."

■ In some respect, the facts in the *Patrick* case were more favorable to the successor in interest to the original grantor than the facts in the present case are to the plaintiff. In *Patrick*, the deed from the grantor contained an express reservation, whereas there was no

such reservation in any of the deeds conveying the lots which surrounded the alleyway in this case. Since the Florence Tucker Estate admittedly owned the fee to the alley prior to the filing of the plat and conveying the six lots, and nothing was said to the contrary in the deeds conveying the lots, the fee in the alley passed with the lots and no estate remained in the grantors.

■■ In interpreting the nature and purpose of transactions like the ones here present, *Patrick* holds that it is the duty of the court to take into consideration the objects and motives of the parties, what they intended to accomplish, and to survey the situation as a whole. It is also "proper to seek for a rational purpose in the language and provisions of the deed[s] and to construe them consistently with reason and common sense." If there is any doubt as to the real intention of the parties, the court is required to reject that interpretation "which plainly leads to injustice and adopt the one which conforms more to the presumed meaning," so as to not produce an unusual and unjust result. Using these standards as a guide, the court experiences no difficulty whatever in finding that it was the true intent and purpose of Florence Tucker Estate, when it laid off and platted the six lots and placed the 10-foot alleyway to the rear of the lots, to convey the fee simple title to the center of the alleyway to each abutting landowner, subject only to the right of the owner of each lot to use the alleyway as a means of ingress and egress to his property. It is inconceivable that the owners of the Florence Tucker Estate believed that any benefit could be derived from the retention of the title to the alleyway, which even the claimant herein concedes was burdened with an easement for the benefit of the adjoining property owners. The only rational explanation for laying out the alleyway in the first instance was to make more valuable the six lots that were being offered for sale. It can also be logically argued that the Florence Tucker Estate not only intended to con-

vey one-half of the alleyway to each adjoining property owner, but that it was actually compensated for the land constituting the alleyway by receiving a higher price for each of the abutting lots. Other facts lending strong support to the inference that the owners of the Florence Tucker Estate intended to convey title to the alleyway abutting the landowners are that Julian Tucker Baker, the claimant, and his predecessors in title, for more than forty-five years, failed to list the property for taxes, or to assert or exercise any dominion or control whatever over the property.

The cases cited by the claimant are clearly distinguishable. For example, in Wofford v. North Carolina State Highway Com'n, 263 N.C. 677, 140 S.E.2d 376 (1965), the plaintiffs were seeking to recover damages for the alleged impairment of the value of their property resulting from the obstruction of a street 100 feet to the east of their property. It was contended that the value of plaintiff's property had been impaired "because of the circuity of travel thereto and therefrom and the dwindling of traffic by their property, resulting from the street obstruction." It was held that "The purchaser of a lot abutting a public street, whatever the origin of the street, takes title subject to the authority of the city to control and limit its use, and to abandon or close it under lawful procedure." The factual distinction is obvious. Another case cited by the claimant is Hine v. Blumenthal, 239 N.C. 537, 80 S.E.2d 458 (1954). Without reciting the rather extensive and complicated facts in the Hine case, it is sufficient to say that they are clearly distinguishable from those here involved. Additionally, in Hine, the Supreme Court cited the Patrick case for the proposition that it is the duty of the courts to interpret deeds so as to "ascertain and effectuate the intention of the parties," and that it is proper to construe deeds "consistently with reason and common sense." In Russell v. Coggin, 232 N.C. 674, 62 S.E.2d 70 (1950), another case cited by the claimant, it is only necessary to observe that

the Supreme Court stated in its opinion that the Patrick case "is not applicable to the facts disclosed on this record."

Finally, it clearly appears that the holding in Patrick is in accord with the decisions in most other jurisdictions. For example, in Cogito v. Dart, 183 Va. 882, 33 S.E.2d 759 (1945), the court stated:

"The general rule is that the boundary on a way, public or private, includes the soil to the center of the way if owned by the grantor and there are no words or specific descriptions to show a contrary intention."

The reason for this principle of law is stated in MacCorkle v. City of Charleston, 105 W.Va. 395, 142 S.E. 841 (1928) as follows:

"The seller of land can ordinarily have no object in retaining a narrow strip along a line of his grant, particularly a strip subject to the rights of others. The strip is of no value when separated from adjoining property. The grantor's use of and concern for it ends with his conveyance, unless some fortuitous circumstance later makes it worth while. The retention of the strip may seriously retard the improvement and further alienation of the adjoining property, especially if this strip is on a private way. Its proximity to his purchase makes the strip of direct and substantial value to the grantee."

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter.

2. The deeds from the Florence Tucker Estate, executed during the year 1920, conveying the six lots shown on Appendix A, conveyed to each abutting landowner the fee to one-half of the 10-foot alleyway, subject only to the right of other abutting landowners to use said alleyway as a means of ingress and egress to Bloodworth Street.

3. When the plaintiff, United States of America, acquired title to the six lots shown on Appendix A, its deeds and stip-

ulated judgments also conveyed the unrestricted fee to the property embraced within the 10-foot alleyway.

4. The claimant, Julian Tucker Baker, is entitled to recover nothing in the form of just compensation for the taking of the 10-foot alleyway by the plaintiff.

A judgment will be entered accordingly.

APPENDIX A

(New Bern Avenue)